## Hannah B. Herbert

*v.*

## James Herbert.

*Filed at Ottawa, January 19, 1893.*

1. RESULTING TRUST — *purchasing land with money belonging to another.* If a man purchases and pays for land with money belonging to a woman living with him as his wife, and without her sanction or consent has the land conveyed to himself, a court of equity will compel him to convey it to her. But the evidence must fairly establish that the woman furnished the money that paid for the property.

2. SAME. Where a man, through a series of years, placed all his earnings in the hands of a woman, living with him as his wife, for safe keeping, except enough to defray his personal expenses, and out of part of such money which she turned over to him, he bought property for their home, and took a deed in his own name with her knowledge of that fact, it was *held* that there was no resulting trust created in favor of the woman, and that a bill by her to compel him to convey to her was properly dismissed.

3. MASTER'S REPORT — *overruling exceptions to immaterial items.*
There is no error in overruling an exception to a master's report for a
failure to find that money loaned belonged to the complainant, where
the title to the note taken on such loan, or the money it represents, is not
involved in the suit.

APPEAL from the Circuit Court of Peoria county ; the Hon.
THOMAS M. SHAW, Judge, presiding.

This was a bill brought by Hannah B. Herbert in the Cir-
cuit Court of Peoria county against James Herbert to compel
the conveyance of certain real estate in Peoria, described in
the bill, which was purchased in 1886, and the title taken in
the name of the defendant, and for a decree confirming the
title in the complainant. The grounds of recovery as alleged in
the bill, briefly stated, are, that the property was purchased
with her money ; that the defendant, by deception, secured
the possession of that money and with it bought the property,
agreeing to take the title in her name, but without her knowl-
edge or consent, procured the title to be made to himself ; and
afterward when complainant discovered that fact and remon-
strated with him, defendant promised to convey to her the title,
but kept putting her off with one pretext or another, etc. The
defendant put in an answer to the bill in which he denies that
complainant's money paid for the real estate, but avers that
he purchased and paid for same with his own money. He
also denies that he agreed to put title in complainant's name,
and avers that same is defendant's clear of every claim and de-
mand of complainant, legal or equitable. Avers that he left
complainant in possession of a large amount of personal prop-
erty of the value of $1000, and notes secured by real estate
mortgage of the value of $5000, all property of defendant, and
complainant has converted the same, and had sole use of said
real estate and said assets. A replication to the answer having
been filed, the cause was referred to the master in chancery
to take testimony and report the same to the court with his
conclusions of law and fact. The master in chancery, after

taking the evidence, reported the same to the court as schedules A, B and C. He also submitted his findings as follows : That the complainant and defendant on or about the 15th of September, 1864, at Gloucester, Wales, took each other for husband and wife by mutual agreement, no authorized marriage ceremony being performed, and for twenty-four years thereafter lived together as husband and wife, and were so known and publicly received wherever said parties resided. That at said date both parties were poor, the complainant being engaged as a housekeeper, and defendant as railroad fireman, at about $5 per week, in which occupation he continued until coming to America. That in the spring of 1864 defendant came alóne to America, leaving complainant at home from want of means, and she afterward came in the fall of same year, on transportation furnished her by defendant. Parties resided a short time in Pennsylvania, coming thence to Peoria in 1870, from there moving to East St. Louis the same year, where they lived until 1878 or 1879, when they moved to Vincennes, Ind., where they continued to reside until sometime in 1885. That at East St. Louis and Vincennes defendant was employed as railroad engineer, earning from $125 to $200 per month, and defendant monthly turned over or gave to complainant a large portion of his wages, out of which she was to pay their living and necessary household expenses, and was to take care of and save what she could for future use, and to provide against future want in case of sickness, misfortune or old age. That both parties were industrious, frugal and economical, and in 1885, when they came to Peoria, complainant had in her possession, in money and securities, the sum of $12,000. That of this, defendant loaned one Heye Dieken, October 1, 1885, $5000, on note payable to James Herbert and Hannah Herbert, or either of them.

That the remainder of said securities, amounting to the sum of $7000, was by complainant, on April 30, 1886, turned over to defendant to be cashed, they having decided to purchase

the premises described in complainant's bill, and on said date defendant bought the same, the money being paid and deed made the following day, May 1, 1886, and title taken in name of defendant. Possession was on said day taken and said parties continued to live and cohabit on said premises as husband and wife as a homestead until May, 1888, when defendant, becoming infatuated with one Julia Bazzard, whom he married in March, 1889, abandoned complainant and their said home and property and refused longer to live with her. Complainant continues to occupy said premises as her homestead, and to receive, use and enjoy the rents and income thereof, and she also received the interest and principal of said Heye Dieken loan when same came due. Said master finds that the relation of husband and wife existed between said parties. The said $12,000, so in possession of complainant, was the savings of complainant from the earnings of defendant, turned over to her by defendant to keep and save, not as her sole and individual property, but for their joint use and benefit, and for the survivor in the case of the death of either. And that said money was the money of defendant.

That the premises in controversy were purchased with a portion of said funds for a homestead, and were used and occupied as such until May, 1888, when defendant abandoned same and property and complainant, and said homestead is still the homestead of complainant.

The complainant filed the following exceptions to the master's report:

Exceptions to master's report: *First.* Because master erred in finding defendant's earnings ranged from $125 to $200 per month, instead of $65 to $75 per month for the first few years at East St. Louis.

*Second.* Because said master has not found that defendant only gave complainant about half his earnings, instead of a large portion thereof.

*Third.* Because said master has not found that defendant gave what he gave complainant absolutely as her own, after paying rent and household expenses, as a separate provision for her.

*Fourth.* Because said master has found defendant was frugal and determined to save, and has not found that he was in the habit of spending money freely, and for licentious and extravagant purposes.

*Fifth.* Because said master has not found the $5000 loaned Heye Dieken was complainant's.

*Sixth.* Because said master has not found said premises were purchased with complainant's money, in whole or in part, and not with defendant's.

*Seventh.* Because said master has not found that $1500 of said money was derived from complainant's mother by her, and other money from other sources than her husband.

Exceptions 8 to 12, inclusive, are embraced in the foregoing, and it will not be necessary to set them out. On the hearing the exceptions were all overruled, and a decree was rendered dismissing the bill without prejudice to any claim of complainant to dower and homestead in the premises.

Mr. JUDSON STARR, for the appellant.

Mr. ARTHUR KEITHLEY, for the appellee.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

The questions presented by this record are in the main questions of fact, and while we have given the evidence a careful consideration for the purpose of a proper determination of the exceptions to the master's report, we do not regard it necessary in this opinion to enter upon an extended review of the evidence taken by the master and incorporated in the record. As to the amount of the defendant's earnings per month during the first few years he was at East St. Louis, it may be that the master in chancery found the amount larger than it should have ·

been, as claimed by the fourth exception, but we do not regard that finding of sufficient importance to call for any special notice. Whether the defendant at that time received $65 or $125 per month could not have any special bearing on the ultimate decision of the case, as will appear hereafter. The second exception is not well taken. Upon examination of the evidence it will be found that the decided weight of the evidence is that the defendant handed over to the complainant his entire earnings from month to month, except small sums used for personal expenses. The third exception is predicated on the theory that the money which the defendant gave to the complainant was given her absolutely as a separate provision. We do not think the evidence sustains the position. The defendant's time was almost constantly occupied in the discharge of his duties on the railroad, first as fireman and later as engineer. He did not seem to have time to devote to other matters. It was therefore his habit, as fast as he drew his pay, to pass it over to complainant, and she took charge of the money, paying the family expenses and retaining the balance in her hands for safe-keeping, but we find no reliable evidence in the record that the money thus turned over was intended as a settlement on the complainant. The money was passed to her to hold and use for the benefit of both parties, as their necessities might require. The fourth exception calls in question that part of the master's report which finds the defendant frugal and economical. It is said defendant was in the habit of spending money freely, etc. We do not think the evidence sustains this position. The evidence tends to show that the defendant was industrious, and if he was in the habit of spending money in a reckless or extravagant manner, the fact is not established by the evidence. Indeed, the fact that the defendant accumulated, from his own labor as fireman and engineer, $12,000, from 1870 to 1885, in addition to supporting himself and complainant, would seem to indicate that he did not indulge in extravagant habits of any character.

The fifth exception finds fault with the master's report because the master failed to find that the $5000 loaned Heye Dieken belonged to the complainant. The note given for this loan was payable to complainant and defendant, or either of them. The complainant obtained possession of the note and collected the amount due thereon, both principal and interest. We do not understand that the title to this note or the money it represented is involved in this litigation, and for this reason, if for no other, it was not necessary for the master to make a finding as to the ownership of this money. The sixth exception to the master's report is as follows: " Because said master has not found said premises were purchased with complainant's money, in whole or in part, and not with defendant's." This exception and exception seven, which raises the question in regard to $1500 invested in the property, which it is claimed complainant brought with her from England, may be considered together. If the property in controversy was purchased and paid for with money belonging to complainant, and the defendant, without the sanction or consent of complainant, had the land conveyed to himself, we think it clear that a court of equity should compel the defendant to convey to the complainant. But before a decree could be rendered in favor of the complainant, the evidence should fairly establish the fact that the complainant furnished the money which paid for the property. The complainant says that in the fall of 1864, when she came to this country, she brought over with her $1500, one thousand of which her mother gave her and five hundred she had earned. The defendant testified that complainant had no money whatever when she came over, and we are inclined to think on this point he is corroborated by the other evidence. In the spring of 1864 the defendant came to this country alone, leaving complainant in the old country for the want of means to pay her passage. During that season he earned money in this country, and in the fall of that year sent transportation and she came over. If she had $1500, as she now

claims, is it reasonable to believe she would have remained in the old country waiting for transportation until the defendant could earn the money here and send it to her? Moreover, when the parties came to Peoria in 1870 Bennet testifies that they told him they had no money, and this finds corroboration in the fact that when the parties came to Peoria they stopped for a short time at the house of a Mr. Davis, until defendant could find work, where they incurred a bill of $65 for board. In the meantime defendant went to East St. Louis, found work and sent for his wife, but Davis would not permit complainant to remove her beds and other things until the bill was paid. The result was the goods were left with Davis until money was earned by the defendant at East St. Louis, and then complainant returned and paid the bill and reclaimed her goods. If the complainant then had money, as she now claims, it is strange that she would leave her goods in the hands of another party as security for a board bill until such time as her husband could earn the money and discharge the bill. It may be that complainant brought over with her money and kept it secreted so that no person knew the fact, but we do not think the evidence when all considered sustains that theory. On the other hand, we think it plain from the evidence that complainant brought no money with her, and she received none afterward except £5 from her mother's estate. When the parties returned to Peoria in 1885 the complainant had in her possession, in money and securities, $12,000. In October of that year they loaned $5000 of the amount to one Dieken. In the spring of 1886 the remaining $7000 was turned over to the defendant, the bonds were cashed and the property in question purchased for $7000, and paid for by the defendant from the proceeds of the money and bonds complainant turned over to him. There is no controversy over the fact that the entire $12,000 was in the possession and control of the complainant when they came to Peoria, but whether the money was her own separate property is the question in dispute, she claiming that it was,

while on the other hand the defendant claims that the money was the accumulation of his earnings from year to year from 1870 to 1885.

· The theory of the complainant is the wages of the defendant were divided each month, one-half turned over to her as her separate property, and the other half retained by the defendant. The defendant, however, testifies that his earnings from month to month were turned over to the complainant, nothing being retained by him except a very small amount for personal expenses when he was on the road; that the money was to be used in payment of the current family expenses so far as required, the balance to be retained by her for the future use and benefit of both parties; that no part of the earnings were set off to her as her sole and separate estate, but was the money of defendant. This is the view adopted by the master in chancery, and under all the evidence we are inclined to think it is the correct one. The record contains no reliable evidence that the defendant retained from month to month one-half of his earnings, but on the other hand the evidence fully tends to show that the earnings were all, or nearly so, turned over to complainant from month to month, at times exceeding in amount $200. It is unreasonable to suppose that the defendant would place all of his earnings in the hands of complainant as her absolute property and thus be deprived of all benefit therefrom in the future, regardless of what his necessaries might be. On the other hand he knew that the complainant was economical and saving, and the money would not be squandered if turned over to her, and hence he was willing to make her the custodian of his earnings, with the understanding that she should hold the same for the benefit of both parties, and not as her separate property. It has been suggested that under the arrangement when the property was purchased it was agreed and understood that the title should be taken in the name of complainant, and that the defendant disregarding this understanding and without the knowledge of complainant had the

deed made to himself.    This position is not supported by the evidence.    James Bennet who assisted in making the purchase of the property, and a witness for complainant, testified :    "In talking about the purchase Mrs. Herbert said she wanted title put in her name.    I don't know why she said it.    I said, 'any man is a    *    *    fool that would put everything in his wife's name,' in presence of Mrs. Herbert, and that one-half would be hers anyway if it was in his name.    Q. 84.    Was it then and there agreed that the title should be in Mr. Herbert's name ?    A.    Well, that is the way it was done anyhow.    I supposed that was the understanding and it was so put."

On cross-examination he testified :    " Mrs. Herbert knew after the place was bought, on the morning of the same day deal was finished, in whose name place was bought.    I never heard her make objection after the conversation where I gave my opinion. That was the only time.    I knew of course in whose name place was being deeded — that it was in James Herbert's — that was the understanding of course."

Moreover, after the deed was made it was immediately placed upon record, and the parties went into the possession of the property and no fault was found with the manner in which the property was deeded until the parties separated two years afterward.    If the property was deeded to the defendant contrary to the understanding and agreement of the parties, it is unreasonable to believe that complainant would have remained silent for two long years, and made no effort to protect her rights until the defendant had deserted her and married another woman.    The decree of the Circuit Court will be affirmed.

*Decree affirmed.*